Good morning, Your Honor. Good morning. Please record. I'm Paul Smith, arguing for the Fox appellants. I'd like to try to reserve five minutes for rebuttal, if that works out. This case involves, as I'm sure you know, the two new services that the Dish Network began providing last year to its satellite subscribers that we believe violate Dish's retransmission agreements with Fox and also infringe Fox's copyrights. The services are Primetime Anytime, which automatically copies all of the shows broadcast by the networks in primetime for a period of time, and it holds them for later viewing on demand, and AutoHop, which causes the viewer to skip all commercials when viewing those programs that were recorded using Primetime Anytime. Essentially, all that a subscriber has to do to take advantage of these services is sign up on their Hopper DVR by saying, I want to enable Primetime Anytime. And the services then run themselves from then on. The viewer doesn't play any further role in selecting shows to copy or otherwise orchestrating the process. That's all done by Dish, which sends signals on a daily basis to the DVR telling it what shows to record, sending other signals telling it here are the places to strip out the commercials. Can I ask a question? Go ahead, Mr. Fischer. Well, I just wanted to get a – I'm technologically challenged. I use an iPad, okay. I have become much better acquainted with my Dish DVR as a result of this case. I found out that there are channels I didn't even know I could access on the guide function. I'm totally neutral in this thing because I really – I know how to run a DVR, but I use it for a very limited purpose, and that's why I'd like a little clarification. Sure. We like to watch Masterpiece Theater, okay. So I set it up on a timer, and I decide I can record all new episodes of Masterpiece Theater, and I do the same with Jon Stewart. So I'm not disclosing any biases here. I just have – we don't watch TV. We don't watch primetime TV. So I've never been offered, as far as I know, PTAT or opera or anything else. But what I do is I do exactly what you're complaining about, which is I build a library, if you will, of Masterpiece Theaters, which doesn't have any ads anyway. So it will stay with Jon Stewart. And when I watch it, I use the skip function. You know, you just skip right through. So I reduce an hour-long program to whatever it is, you know, 20 minutes without the ads. And I have a whole – you know, I have two weeks, if you will, of those Jon Stewart programs, just to use that as an example. So I understand that what PTAT or the primetime anytime is doing is this bulk – establishing a bulk library, if you will, or something that I can hold for eight days, and that it automatically imposes in it when you qualify for the hopping function, it automatically does the skipping. Is that correct? It does, yes. Okay, now that's my – so that brings me to my question, which is where does the skip function get embedded into the replay? Because right now I have to – you know, if I'm picking it up, obviously a week after it's been recorded, I'm manually doing it. Right. What's the difference – how does the hop function get embedded in the data? Because I know there's an issue of making three copies that – Right, well, I understand it. Quality control. What they do is when the show is being originally broadcast and is being sent over just to be viewed live, they have people viewing the shows and marking them when the commercials begin and end. And then that is translated into some kind of announcement file, which is just a form of software, which they then transmit to your hopper. So they're not making any copies at that point. That's the same question I – They do a second thing, which – No, no, I just want to know that they don't make a copy at that point. Those people don't make a copy, no. Okay. It's a second group of people who make copies and try to figure out whether or not the markings were correct. I understand. That's the quality control. But the markings are then transmitted to the hopper so that by 3 a.m. after the show has been on that prior evening, you can start watching it when the commercials automatically skip. But when the technicians are watching the show to decide where to mark it, they are not making a copy other than the quality assurance copies that – That's my understanding, Your Honor, yes. Now, I think it's – there's two ways you could go on this case. I think Dish would rather be talking about copyright and Sony and first principles, but it seems to me that it's easier to resolve this case just by looking at what Dish agreed to do and not to do in its 2002 retransmission agreement with Fox and in the 2010 supplement to that agreement. In that 2002 agreement, it said they would not provide the programming except on a sort of straight-through, analog, real-time basis, that it would not make copies of the programming, it would not provide it on an interactive basis or a video-on-demand basis or any similar basis. It also agreed in 2010 not to do anything that would circumvent the protections of the contract or to frustrate the protections of the contract. And that 2010 agreement, of course, included an additional exception to the no VOD rule. It said if you want to do VOD, we'll let you do it. The key condition – and the word was condition in the contract – was that you have to disable fast-forwarding so the commercials have to be watched. And so it seems to us very clear that the parties did everything they possibly could to make it clear that Dish was not authorized to do what they have done now, which is provide the functionality of video-on-demand with the commercials being skipped. And that would apply to my Jon Stewart recordings? No, Your Honor. I think there's a fundamental difference that has to be drawn between something that you choose to record, a particular program – maybe it's a whole season of a program – but you are a viewer using the DVR to make copies. This is a different thing. This is telling them we want all the prime-time programming on this station. You at that point are no longer – maybe six months later, that's still running. You have no idea what shows are even on that network or whether you were interested in them or not interested in them. They're just constantly replenishing this hundred hours of programming for you to browse through and select from. And that, I think, is a fundamentally different kind of process that is flatly inconsistent with the notion that they wouldn't provide anything similar to a VOD function. Well, a VOD function on my version of Dish is pay-per-view. It is. Yes, it often is. You have to pay for it. As far as I can tell, they're all – it's way up in the 500 channels. I think they have different contracts with different providers in terms of whether or not you can get On Demand for free or not, and it may well depend on what show it is as well. But why isn't Masterpiece it or Video On Demand then? If it's not the cost of it, if I record all of Masterpiece, whether I want to watch them all or not. Because you've recorded it and made a choice of that show to be recorded. Obviously, you can come up with hypotheticals in this case. Well, let's say – I understand what Primetime Anytime says, is you've got all four networks, and you can opt as the viewer to make a recording of that bulk, and heaven forfend that people have the time to go through and watch every one of the programs that they picked up that way. But they're time-shifting, aren't they? They're just simply saying, okay, I'm not sure I want to watch all these now. I now have a menu of things I can watch when I get back from vacation or whatever. Your Honor, at some point, and I think they're way beyond that point here, when you say I want them to record everything that's been broadcast on this station, this station, this station, and this station, whatever it may turn out to be, and I just want to have it there to browse later, that is fundamentally different from what the contract said they were doing. And if we move on to copyright, in the way that they are orchestrating the copying, manipulating the copying, running it all, and the user's not doing anything after that initial sign-up for the service, it's very clear that they are doing the copying. But I'm interested in your contract theory. That's why I'm trying to understand what crossed the line. If it wasn't the fact that – I'm trying to understand your video-on-demand concept. You're talking about increasing the numbers, but in either case, I'm making the decision as a viewer what I want to embed on my recording device so I can come back later and pick up what I want. Only in a limited sense. You're simply saying enable a service that records everything this station may have on it, even if you're not aware of what that is, even if it's not something you would ever want to watch. To say at that point you have chosen it, it seems to me gives no meaning to the contractual protections, especially given that it can't be anything similar to VOD, they can't circumvent this, they can't frustrate the purpose of the contract. Under their logic, if it's not four stations, it could be 40 stations, and they could keep the programming there for 100 days or 150 days, and you would have thousands of things to choose from, and they would say, well, you chose to record that, so it's just time-shifting. At some point, it becomes a VOD service by any other name, and the fact that it's stored on the DVR doesn't differentiate it. As the DISH executive who testified here acknowledged, when they do licensed VOD, they often store the programming unbeknownst to the user on the DVR, and so if somebody then orders it licensed VOD, it comes from the DVR. That is a common function for VOD in the sort of orthodox sense that they would call VOD. At some point, it seems to me you have to recognize that they are designing around a contract that they promised not to design around and doing a function which they promised not to do. We're hearing a preliminary injunction order. Assuming we agree with you in your contract theory, how do you show irreparable harm under that theory? The district court acknowledged that there was irreparable harm caused by the services that I'm talking about. She said it competes directly with your licensed services, the Hulu service and other things that you've licensed. The judge acknowledged that. That it interferes with your ad-based model and will cut ad revenue. That it deprives you of control of your programming. The only reason that those didn't end up having any significance in her analysis is because she didn't find a violation of the contract or of the Copyright Act, except with respect to these QA copies. As to those, she ignored the harm caused by the services and tried to look only at the harm caused by those copies. There isn't any dispute here, or at least the district court didn't think there was any dispute about whether there was a kind of irreparable harm that you would have in a normal copyright case of this sort. This is an unlicensed service that competes directly with licensed services that we get paid for. People pay for video on demand on Hulu and other places, and that by itself is enough. That sounds like a damage claim. No, no, no. It's irreparable because it's impractical. Is part of your claim that the copying of ad-free programming interferes with your subsequent marketing of DVDs? The issue of DVDs hasn't come up so much. The more direct comparison is... I haven't seen that as part of your case. That's why I'm asking. No, I think we're more concerned about the ad-free video on demand services that we have out there and licensed. And this does essentially exactly the same thing without having gotten a license. It's functionally identical. But they decide when they accept that it's available sooner to the viewer than our carefully sort of titrated process of sequencing these things is designed to allow. And you know that when you're a copyright owner, to have somebody say I'm going to use your content in a way that other people have to come pay for at a time when I would rather do it instead of you, that is a major fundamental problem for a copyright owner. If I might just turn quickly to the... Can I just ask you another question? You're the judge. You'll get enough time to talk. You really will. These are questions to help me analyze the case. Okay. So on the copyright concept, when you are transmitting, when Fox transmits a program, it transmits it as a drama, comedy, but it has embedded within it ads. Okay? I understand, however, that you are not claiming that the program as packaged, which includes your copyrighted program and ads to which you do not own a copyright, but you're not claiming that the package itself is a copyrighted work. Is that correct? The show with the commercials? Yes. Are separate works. Separate works. Absolutely. All right. The ad skipping under the copyright analysis is primarily relevant not to the direct copyright infringement because if Dish is making the copies, then they're clearly infringing. No, I understand. They're copying the shows. It's more relevant to the secondary infringement claim because if you go back and look at Sony, a fundamentally important part of the analysis under Sony was the factual finding that was made that there was precious little ad skipping going on, and therefore it didn't interfere with the commercial model and cause competitive injury to the networks that were the copyright owners that were suing Sony in that case. Here you have fundamentally different facts because once people can just automatically never see a commercial, it competes with licensed VOD services. It takes away from ad revenue,  When does the contract expire? Contract, I believe it's 2016. After that, I suppose you can redraft the contract to cover this kind of thing. We certainly could, Your Honor, but I must say we tried awfully hard the last time to do everything we could. This just wasn't envisioned then, it sounds like. It certainly was. It said any VOD service, any kind of interactive service, anything similar to that? There's a limit to it. What's similar? Everything is similar to everything. You're recording programs and watching it when you want. That's sort of video on demand in a sense. But I think the fundamental difference is when the viewer is selecting the programs, it's just different from the viewer saying, give me everything that's on this station or everything that's on these 17 stations. The judge said that when the viewer clicks the button and says, I want to record all these things, the viewer is making that decision. But that really can't be the right analysis. After that happens, then DISH does everything. It sends commands on a daily basis to manipulate the process, tell it what shows to copy, which ones not to copy. But what if it does? If the decision in the first instance is the viewer's, so what? Because under the Copyright Act, there's no reason why they can't both be responsible directly for making those copies. And I think that that kind of direct participation in the process of the copying, along with designing your system to be set up this way, ought to be the kind of active involvement in the copying that is very different from simply giving somebody a DVR and saying, do what you will with it. DISH is here participating in the copying, orchestrating the stripping out of the commercials, telling it when to adjust for the Super Bowl or for the Olympics. All of those decisions are being constantly made not by the viewer, but by DISH. They are at least a partner in the copying. It might be that the right analysis is that they're jointly liable, which is perfectly possible under the Copyright Act. But I submit to you that if you let people design systems like this that are designed to make lots of copies, and then they participate in the operation of it on a daily basis and say, because the viewer clicked once to enable this system six months ago, you are not directly involved. But the cases don't support that, do they? They very much do support that. What about CableVision? CableVision is a very different case on the facts. It provided there a DVR functionality, which is to say the viewer would pick the program, decide to record that program. It would be recorded on a server over here at the central server and then played back at the behest of the viewer. The company, having set up the capacity on the server and the software to allow the person to make those copies, had no role at all in operation of that. Some people thought that was enough participation to have set it up that way, and some people wouldn't. But our case is a much stronger case for active involvement than that, as even Judge Gee said I think several times in her opinion. There's vastly more facts here that show DISH on a daily basis participating in the process of even selecting the shows that are going to get copied. What case is the strongest one for you, would you say? I would point to the Warner Brothers versus WTV. There's a district court decision out here where this was an Internet-based service for delivering programming without a license where the customer would order it up and it would come over the Internet. There's the WPIX versus Ivy case, a very strong similar sort of Internet delivery of unlicensed programming, and the court said it's infringing. Those seem to be... Anything with video recorders? Well, we don't have one where there's been a service that does this. So I think what you have here is somebody saying, well, if we can get away with doing the DVR functionality on central servers, maybe we can get away now with doing VOD and calling it a DVR functionality. So this is pushing the envelope. So I would say this is certainly the first company that's tried to do this. Do you think our cases in the Digital Millennium Copyright Act, UMG versus VEO and Columbia versus Fung, do they have any? I understand that they're safe harbor decisions, but when you're talking about the involvement of DISH, that sounds to me like finding in Fung that there was so much participation in the infringing activity. There are certainly echoes of that. You might want to let me finish. I'm sorry. Do you think that there is any analogy there that is helpful to you? Well, I think there are echoes of that, and you did draw in those two cases the distinction between the sort of more passive provider of space for people to post things, which was VEO, and the more active. And I think it is an analogy. I'm not sure I would suggest that you go to those cases to find the legal standards that would apply for direct liability under the Copyright Act, but it is a relevant analogy. Your time has expired, but I'll give you some time for a bottle. Thank you. Good morning, Your Honors. May it please the Court. Josh Rosenkranz for DISH Network. Your Honors, all that PTAT and AutoHop do is to make it easier for people to do things that we've been doing for decades. Whether we're talking about the copyright claims or the contract claims, listening to Fox's argument, I'm never sure what exactly they're challenging or on what basis. Is it the block recording of PTAT? Is it the skipping of AutoHop? That's a critically important question, because one has copyright interests attached to it, the other doesn't. One is being, they're being challenged on completely different theories of both infringement and market harm, and the two are completely severable from one another. What about the contract claim, though? It seemed that they were interested in trying to prevent what DISH is doing. So how do you respond to his arguments on the contract? Well, so let me preface my answer, Your Honor, with two observations. The first is they just cannot get a PI on a contract claim. PIs on contract claims are overwhelmingly disfavored, and particularly so in this situation where damages are completely calculable and where Judge Gee made factual findings of non-breach to which this Court should defer. But the answer, the focus has really been on two things with respect to the contract. The first is who is doing the copying, and the second is VOD. So let me start with VOD. It's an undefined term in the contract. Fox clearly did not anticipate this. But there is, as Judge Gee found as a factual matter, a critical distinction between video on demand and what's going on here. Video on demand. The contract says video demand or similar types of technology. Why isn't this similar? Well, Your Honor, it's similar in the sense that both are involved with time shifting, but by that theory, any recording is similar to VOD. So what would be similar under this contractual language, video on demand or similar basis? What would be similar, do you think? Your Honor, I honestly cannot think of something that's similar to VOD and isn't VOD, but I hasten to add that the contract uses the term similar not just with respect to VOD, but also with respect to time shifting and interactivity. Wouldn't you agree that by saying video on demand or similar, it wasn't being limited to video on demand? It had to have included something similar. Yes, Your Honor. So then the question is what is the critical distinction between video on demand and other features? The critical distinction is who is it that makes the decision up front what will be in this package definitively. In video on demand, the content provider says these are the shows that will be available to the consumer the moment they are ready for the demand, and these are the shows that are not. With PTAT, the consumer has to make a decision in advance whether or not they are going to record in order for it to be even on a list anywhere. That's fundamentally different from video on demand in exactly the way that Judge Gee described. Not much of a difference, though, as far as the consumer is concerned. Well, it may be. Well, I actually think it is a very big difference as far as the consumer is concerned. A consumer goes to video on demand to see an offering of items that they don't have the means to buy. I'm familiar with both concepts, but I view them as pretty close. Well, again, I come back to the fact that this is an undefined term and that Judge Gee made a factual determination of no breach. And, of course, this is a contract claim for which damages are calculable. But I was saying before that PTAT existed without AutoHop for four and a half months before Fox even made a peep about it, and, of course, AutoHop can exist without PTAT. So let me begin with what precipitated this lawsuit, and that's commercial skipping. And to respond to a factual question that Judge Fisher asked, the commercial skipping also has to be initiated by the consumer. At the beginning of each show, the consumer is asked the question, do you want to activate AutoHop or not? Now, the problem on the commercial skipping is that, as Fox acknowledged here, it has no copyright interest in the commercials. And skipping ads does not implicate any of the bundle of rights in Section 106. It's not copying. It's not distributing. It's certainly not displaying. Fox has no more right to make us watch its commercials than the L.A. Times has to make us read its Sunday ad insert. If AutoHop and the primetime set up the whole constellation of both of them together, if that is video on demand or something similar, doesn't the contract require you to disable the fast-forward feature? No, Your Honor. Let me just make clear the two different VOD arguments that are going on. The first is under the original contract that we are not allowed to distribute on a VOD basis. And as Judge Gee found out, we're not distributing on a VOD basis. We're distributing by contract exactly as the contract allows us to, so we're authorized to do that. It's the box that is then recording. Then there's a separate contract. There's the 2010 letter. The 2010 letter was about Fox's VOD offering. Fox puts together a package not just of eight days' worth of shows or, you know, the shows that were aired in the last eight days, but of all of Fox, the entire seasons, and offered that to DISH, by the way, free of charge to make available, that is, to distribute to consumers on a VOD basis. As to that offering, which we never availed ourselves of, we are not allowed. We must disable fast-forward. But as to items that consumers themselves make the volitional decision that they will record, there's no requirement in the contract that we disable fast-forward. Now, Fox only underscores the point about commercial skipping with respect to the copyright claim by agreeing that the features that people have been using to skip commercials for probably over a decade are, in fact, perfectly fine, the one-minute ad skipper, the 30-second ad skipper. Fox has never explained to us why, from a copyright perspective, one is okay and this other feature is improper, at least not in a way that the Copyright Act cares about. If consumers are allowed to skip commercials, they're allowed to skip commercials, and nothing in the Copyright Act says that it must be inefficient. But let me go to the question of direct infringement, which is also a contract question, and specifically now we're talking about shifting to PTAT. I'll start with an issue that is common to both copyright and contract, which is who is making the PTAT copies. Now, Fox has never disputed three points that completely undermine its position that it is DISH making the copies. The first is that PTAT never makes a copy of any show unless and until the consumer activates PTAT. And it's not just necessarily once. The consumer can change the permutations of PTAT on a daily basis. Second, on any given night, less than half of all PTAT users, excuse me, Hopper users, actually activate PTAT. So DISH is obviously not in control of who's doing the copying. And third, PTAT requires the viewer to make a series of options, not just on or off all nights, all networks. It could be some networks, some nights, for two days versus eight days, for a total of 13,000 possible permutations.  The consumer is. And in fact, the consumer gets more control with the Hopper than they do with a normal DVR. Without PTAT, the Hopper, like any DVR, allows the consumer to take, to record, that is, the entire Fox lineup. With TiVo, if you look at page nine of our response brief, the red brief, there's a user interface. It's a push of a button, and you can record seven to 11 on Fox for the entire week. PTAT simply makes it easier for consumers to make those recordings that they believe are most popular and that they're most likely to want to watch. That doesn't put DISH in charge any more than when you order the prefix menu at Spago and you get foie gras. Spago has made the decision that you're ordering foie gras. So turning momentarily then to the issues of secondary infringement, and more specifically whether consumers are violating the law when they are the ones activating PTAT. First, one big distinction between this case and Sony. In Sony, people were getting the works for free. Here, consumers are actually paying Fox for the ability to watch Fox programs. To the tune of $100 million over a five-year period, that money is going from consumers to DISH into Fox's pockets. Now, Fox is in a precarious position here. It's trying to thread a very fine needle. On the one hand, Fox has to get around Sony. On the other hand, Fox insists that all the other DVRs in the marketplace are perfectly fine. But Fox never tells us what it is about PTAT that makes it so much worse than what consumers were doing with the VCR or what they're doing with DVRs day to day. It can't just be that the hopper has a big memory. There are a lot of DVRs with big memories, and Fox hasn't challenged the size of our memory. It can't be that the hopper makes it easier to record on a block basis. The TiVo example is a perfect example of recording on a block basis, and Judge Fisher's Masterpiece Theater or Jon Stewart example is another. DVRs have this ubiquitous feature that you can record an entire season going forward, whether or not you intend to view it. If the hopper is making consumers into bootleggers, then we are all bootleggers now. Now, Fox talks a lot about this being a library, a library of shows, but even that does not distinguish the hopper from other high-capacity DVRs. Again, the difference is- Except it's a different work. Excuse me, Your Honor? Except it's a different work. In a sense, it's a derivative work because it's not the same. If you record on a TiVo, for example, you get all the ads. If you record on hopper, it's a different work that you see. Well, Your Honor, I understand the point. Two answers. First, Mr. Smith has acknowledged that the work is the show, not the commercials. It was a strategic admission- A derivative work is really not in this case, but it's a different work. It isn't for yet another reason, but first let me just explain. The reason it's not in this case is because the Family Movie Act would allow consumers to skip commercials if we're all a single work. So Fox has made the strategic decision not to call it a derivative work. But in any event, it's not derivative. The commercials are still there. They're just being skipped. The commercials are not being removed. And, in fact, if you activate AutoHop and then rewind, you will see the commercials. So the work is the same. Now, it makes no sense for Fox to be arguing that it is fine for Judge Fisher to record all of Jon Stewart for the entire season going forward, or it's fine to record tomorrow's four segments on prime time. But somehow it becomes improper when a user records the other 13 or 14 shows on the prime time schedule for the week. Now, Fox runs through the various fair use factors as if Sony has never been decided. But Sony was decided. Fox has argued, for example, that there's no transformative use here. But the time shifting on a VCR is every bit as transformative as time shifting on a DVR or vice versa. And the Supreme Court found in Sony that this was fair use and passed factor one with flying colors. Now, on market harm, I just want to be clear what Fox is arguing, particularly with respect to PTAT. Dish subscribers, as I already said, are paying for this content. Fox's argument is that when I miss a show, Fox has an opportunity to sell me that show again. And that it's somehow unfair to put Fox in a position where it cannot sell that show again. Not always, Fox acknowledges, because Fox says that time shifting is perfectly permissible. But somehow it's different here, Fox argues. But Fox hasn't pointed to anything in Sony or in copyright law generally that draws that distinction. Now, because the court was focused quite a bit more on the contract claims, let me just circle back and make another point about the contract claims. Fox keeps referring to this as, to the clause in this case, as a no VOD clause. It is not a no VOD clause. It is a do not distribute on a VOD basis clause. And as I was saying earlier, and I just want to embellish just a little bit, PTAT is not a distribution. The whole point about distribution that Judge Gee found was not that the contract somehow redefines distribution, but rather that the initial distribution is authorized by contract. Fox doesn't disagree with that. And what's happening down in the box is a recording. Now, I do want to get to the quality assurance question. And you said that the 2010 is a non-circumvention that modifies only, or applies only to Fox's own package of VOD? No, Your Honor. Let me just separate two things. The 2010 letter says that you cannot fast-forward during commercials. That, excuse me, you cannot, you have to disable fast-forwarding. When DISH offers what's called Fox VOD, that's Fox's offering, it also adds a non-circumvention clause, which applies, sort of a generic clause, that applies to the entire contract. And as Judge Gee found, as a matter of fact, there simply was no evidence in this record as to exactly what the non-circumvention clause was there to do. Now, I do want to get to quality assurance, unless the Court has more questions about contract. Now, the District Court was certainly correct that quality assurance does not cause the harms that Fox is complaining about, any more than proofreading a purportedly infringing a book causes the harm that the book causes in the marketplace. Mr. Rosengrant, I had the impression that the quality assurance copies have stopped. Is that correct? We've made the voluntary decision to stop the quality assurance copying for the time being, but Fox is still seeking a P.I. from this Court on it, so it's still very much a live issue. But by the way, that goes to proof causation. Fox is still, whatever harm Fox claims to be suffering, it claims to be suffering that harm without regard to whether we're doing quality assurance. But there's a really, really important legal point at stake in how Judge Gee decided that question as a matter of copyright law. And the 33 law professors who wrote that amicus brief before this Court really underscore it very powerfully. In case after case, this Court has emphasized that when you make a copy that never sees the light of day, and you're using it to provide a better device, to test a device for research purposes, or even in Universal versus Sony, you display it to the public at large, but it's for demonstrative purposes, that that is intermediate copying and it is fair use. This case is the classic case for the application of that principle here. These are three copies. They never see the light of day. They are not going into the marketplace. You're speaking as a matter of copyright law. It's fair use. That is correct, Your Honor. The contract, however, says they won't make any copies except as authorized. Right, and so Fox has a contract argument on the basis of which they really can get no damages, excuse me, on the basis of which they are entitled to seek damages. I think they won't be able to prove damages, but more importantly, that's not a basis for a P.I. So I was saying the reason. Why not? I mean, if you are making copies in contravention of the contract, and there's no dispute about the facts, it's only a question of law, why shouldn't the judge say stop breaching the contract? Because the law of New York State and this, which governs this contract and this Court's law under the P.I. factors says that contract claims are very rarely and only in extraordinary cases should be subject matter for any injunction, much less for a P.I. I thought I understood you to say that it's going to be next to impossible for them to prove damages. And if there is an ongoing breach and it's hard to prove damages, I don't understand why the judge wouldn't say stop the breach. Your Honor, my point is it will be next to impossible for them to prove that they've been harmed at all. So the breach should just go on in perpetuity or what? Well, so certainly at a point at which FOX actually proves its contract claim, and I want to make it clear the fact that we did not lard our brief with an additional issue of contract interpretation doesn't mean that we don't have a contract defense here that will be litigated below. But we made the decision not to burden this Court with a contract argument when it is so clear under the law of this Court and New York law that you simply don't get a P.I. on a contract claim. And I want just one last point on that, because FOX keeps making the argument that if it's a contract claim on a license, it becomes a copyright violation. That is just plain wrong. This Court's opinion in S.O.S. stands very powerfully for the proposition that if you want to prove copyright infringement, you have to prove the elements of copyright infringement. The contract comes into play only if we assert the contract as an authorization defense, which we haven't. So if FOX wants to even have the hope of getting preliminary injunctive relief, it has to prove the copyright claim. If there are no further questions, we respectfully request that the Court affirm the P.I., the denial of the P.I., but in any event urge the Court to examine that copyright question, which really is critical to the future of research and development. Thank you, Your Honors. Thank you, Counsel. I'll put five minutes on. Thank you, Your Honor. If I might start by addressing this issue of whether or not we could get injunctive relief in this case based on the contract. My understanding of New York law, and we cite cases on page 30 footnote 9, including registered.com versus Vario, is that under New York law where a showing of irreparable harm has been made and there's an ongoing breach, you can get injunctive relief. And that is particularly true where the contract is a license agreement and the conduct that is breaching is also conduct that exceeds the scope of the license. There's plenty of law that supports that. Why aren't damages? Why can't we calculate the damages? Well, Your Honor, this is a classic situation. And the Second Circuit Ivey case is probably the best example in recent times where you have unlicensed service competing with licensed services and also taking away ad revenue. For us to have some way to come in and say, well, the amount of revenue that we got from these licensed VOD services and the amount of impact on our ads was X dollars is just inconceivable. And there's case after case out there that says you don't have to try to prove the impossible in a situation like this. This is a classic example of irreparable harm for copyright purposes. Well, for copyright purposes perhaps, but not for breach of contract. Well, when the contract involves a limitation on the scope of a license and says the condition on your taking this license is that you won't distribute VOD without disabling Fast Forward, then I think it's also viewable as essentially a contract case. That's what the cases say. More fundamentally, I think the logic of their position continues to be, and Mr. Rosenkranz continues it today, is that they could instead of having four stations and four hours, three hours a day, it could be 100 stations and the material could be reserved on your hopper in perpetuity. You could have building up tens of thousands of shows to watch on demand and it would still be, to use his term, fundamentally different from VOD because the consumer chose to sign up and chose those 100 stations to record. But the reality is it's not fundamentally different and all you need to know is look at how Dish marketed this to its consumers. And I would refer you to page 385 of the excerpts of record where it said, we've invented commercial free TV where you get on demand access to a whole variety of shows. That's the way that this functions and that was the commercial appeal of it. Well, that's a marketing phrase, but you're postulating consumers loading up on a lot of programs where they're then going to go back and cherry pick over perpetuity. I mean, to what extent does exaggeration overtake the logic of your argument? Well, you know, I think it's important in a situation like this for the court to say, what is the limits of their position? I mean, this is essentially a test case. Why don't we just deal with what's going on here? It does seem to me you have a legitimate gripe, Fox does, that the technology is allowing consumers in easier and easier fashion, progressing from videotape now to DVR now to bulk ad skipping, to get rid of or skip over commercials, which is, it seems to me, the heartland of this case. But the problem that we confront is to find out whether or decide whether or not there's a copyright issue here or whether there's a breach of contract. Without regard to, particularly in a contract case interpretation, imagining, you know, the evil consequences, what is the crux of your case as it is now? Is it your contract? You really do believe they're violating what the contract set out explicitly, in Fox's view, to happen? Well, I think we're right on both, Your Honor.  The service, as it currently exists, without it being 100 stations, just four stations, violates the contract, because instead of choosing a show to record, the consumer is simply saying, record everything on these networks for me indefinitely, and it will always be available to me, a rolling library. And I submit to you that a fair reading of the contract makes that at least similar to a video-on-demand service, and that the reference... And if it were a fewer number, is it the number that you're saying makes it similar? Well, the fairest line is probably the distinction between choosing a show you want to watch, that you're aware of, and choosing a station where you don't even know what shows they're on. You can do the same thing with TiVo, though, and transfer all the, keep on your terabytes worth of material there and transfer it to your computer. I mean, that's possible technologically with other services. It is possible, Your Honor, but this is set up in such a way that all you do is turn it on one time and they do everything for you, and at some point... You can do that with TiVo, too, pretty much. No, you have to, on TiVo, you have to decide what to record. You have to tell it. You don't have to do any of that stuff. You simply say, turn it on, and it's already enabled. The default position is all four stations, all seven days. That's just, you push the button one time. At some point, this becomes just a fundamentally different thing. I think both as a matter of contract law and as a matter of copyright law because they're doing everything after that, and it is an active participation that they have in the process of keeping the service running, both sending the signals to tell it which shows to record, what prime time going to count as this night as opposed to last night, sending out the signals to strip out the commercials. All of that is being done by DISH continuously. And so, you know, as a matter of copyright law, I think they're clearly at least equally responsible with the consumer for making the copies, and they don't have the kind of right to do that that the consumer may be able to claim under Sony. So it seems to us as a matter of copyright law, we should win as well, but it's hard to see how the parties could have done a much clearer job under the contract of trying to make sure that all that they were going to do was retransmit the signal, which is what a retransmitter does. The signal as it was broadcast would be sent straight through to the consumer in real time, and that's all they were authorized to do in 2002, and nothing else. That's what the agreement says. That's what it was intended to say. And then we have the modification that says, well, if you can do VOD, make sure you disable fast forward. And, of course, they did the opposite. They made it automatic that there will never be advertising that you'll see. All you have to do is enable this AutoHop thing. Our questions have taken you over your time. Thank you. Thank you, counsel. Thank you both for your excellent arguments and briefs, and the case will be submitted for decision. The next case on the oral argument calendar is Cagle v. Holder.
judges: Thomas, Silverman, Fisher